STANLEY A. REVZIN and MARCIA K. REVZIN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Revzin v. Commissioner
Docket No. 7911-74.
United States Tax Court
T.C. Memo 1977-68; 1977 Tax Ct. Memo LEXIS 372; 36 T.C.M. (CCH) 289; T.C.M. (RIA) 770068; March 16, 1977, Filed Stephen Wolfberg, for the petitioners. Jack R. Selzer, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined a deficiency in petitioners' Federal income tax for the calendar years 1968 and 1969 in the amounts of $580.50 and $82,961.33, respectively. Certain concessions have been made by petitioners, leaving for our decision: (1) Whether petitioners received constructive dividends in 1969 when two corporations in which one of petitioners owned stock made certain payments to another person in exchange for that person's stock in those corporations; (2) Whether petitioners received constructive dividends in 1969 when a corporation in which one of petitioners owned stock transferred an automobile to the other stockholder; and
*373 (3) whether petitioner realized income in 1969 when various transfers were made and actions taken pursuant to certain documents executed by one of petitioners and the other stockholder on August 8, 1969. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioners Stanley A. Revzin and Marcia K. Revzin, husband and wife, resided in North Dartmouth, Massachusetts at the time of filing their petition in this case. They filed a joint Federal income tax return for calendar year 1969 with the District Director, Internal Revenue Service, Boston, Massachusetts.
Stanley A. Revzin (petitioner) was employed in 1956 and 1957 by Lewyt Manufacturing Corporation of Long Island City, New York. There he met another employee, Robert A. Pullman. Petitioner and Mr. Pullman went into business together in January of 1961. They formed a corporation under the laws of the State of Massachusetts named Bristol Electronics, Inc. (Electronics). Mr. Pullman became president, and petitioner vice president. The stock was owned equally. After January of 1961 and before August 8, 1969, petitioner and Mr. Pullman acquired other joint interests. They formed and *374 acquired equal stock ownership in Bristol Industries, Inc. (Industries), a Massachusetts corporation. This corporation owned a building at 651 Orchard St., New Bedford, Massachusetts, which was the principal place of business of Electronics. Industries' sole business activity was renting this building to Electronics. Petitioner and Mr. Pullman also formed the R & S Trust which acquired a building. Each of them had an equal interest in the trust. Furthermore, they jointly acquired several lots of land in North Dartmouth, Massachusetts.
Electronics was engaged in the manufacture of electronics equipment. Its sole customer was the United States Government. Although a profitable company, Electronics had several problems in 1969. Its credit was bad, and its equipment was old. Its customer was requiring strict accounting for use of progress payments. The principal contract under which it was operating was scheduled for completion in August or September of 1969, and a new contract was obtained in July of 1969. The new contract was of marginal profitability, but was accepted in order to stay in business. Electronics held in its name 683,000 shares of Transdyne Corporation (Transdyne) *375 stock. The stock had been purchased in 1967 or early 1968 for $6,830. Funds for the purchase were provided equally by petitioner and Mr. Pullman. Transdyne was a company engaged in manufacturing electronics and mechanical devices.It was headquartered in New Bedford, Massachusetts and had a plant in Newport News, Va. Transdyne entered its fiscal year ending September 30, 1969, with a deficit in retained earnings of $558,357. During that year it suffered losses in its current operations totaling $1,038,521, and, after certain noncurrent adjustments, it ended the year with a retained earnings deficit of $1,762,142. Total current liabilities exceeded total assets by $675,046 on September 30, 1969. In February and March of 1970, the company was in the process of selling substantial portions of its operating assets. In late 1968 or early 1969 the relationship between petitioner and Mr. Pullman began to deteriorate. Mr. Pullman became antagonistic toward Electronics' customer, the United States Government, and was discourteous and abrasive in his dealings with its representatives. One government official threatened the corporation with loss of business if Mr. Pullman did not withdraw *376 from the corporation. At this point petitioner asked Mr. Pullman to step down as corporation president, but Mr. Pullman refused. He likewise refused either to buy out petitioner or be bought out. After attorneys for petitioner and Mr. Pullman failed to obtain an agreement, they arranged for an intermediary, Judge James M. Langan, to attempt to find grounds for a division of the parties' business interests. Judge Langan was an attorney who graduated from Boston College School of Law in 1934. He was experienced in drafting purchase and sale agreements. Judge Langan met with both petitioner and Mr. Pullman in late July of 1969 and received suggestions from them regarding the settlement. Petitioner understood that Judge Langan was to make an offer to Mr. Pullman that Electronics and Industries retire Mr. Pullman's stock in those corporations for a payment to him of $100,000 and transfer to Mr. Pullman of the Transdyne stock they held. Judge Langan drafted a document that indicated the guidelines to be followed in effecting the separation of interests of petitioner and Mr. Pullman. He did not intend the document to bind the parties as to the form in which the separation was *377 to take place, but he intended it to bind them to a separation and establish the basis of the separation. He did not consider tax aspects when he drafted the document. Petitioner, his attorney David S. Barnet, Mr. Pullman, his attorney Joseph P. Harrington, and Judge Langan met in Judge Langan's chambers in Wareham, Massachusetts on August 8, 1969, to discuss and finalize the separation. Judge Langan produced the document he had drafted for examination of the parties. Neither petitioner nor his attorney had seen it before. The parties' attorneys discussed the document and formulated two additional agreements. The parties themselves at no time discussed the form of the separation transaction. The parties executed the original document prepared by Judge Langan and the two additional agreements at the same time in the meeting on August 8, 1969. Petitioner signed the documents after his attorney explained them to him and after he thought he understood them. The attorney had advised him that the document drafted by Judge Langan, standing alone, would create a personal obligation on petitioner to buy the stock, but that the three agreements taken together would require the corporations *378 to purchase their stock from Mr. Pullman. The attorney intended the additional documents to make it clear that the corporations were the entities making the acquisitions of stock and at the conclusion of the meeting on August 8, 1969, the attorney was under the impression that everyone present at that conference understood that the corporations were to acquire the stock. Petitioner at all times during the negotiations and when he signed the agreements understood that each of the corporations, Electronics and Industries, was to redeem its stock held by Mr. Pullman and each pay $50,000 to Mr. Pullman as a redemption price. The document prepared by Judge Langan and executed by the parties on August 8, 1969, is set forth below: AGREMENT OF SALE, PURCHASE, DIVISION AND DISSOLUTION WHEREAS, ROBERT A. PULLMAN is the owner of: 1. Fifty (50%) Percent of the stock of Bristol Electronics, Inc.; 2. Fifty (50%) Percent of the stock of Bristol Industries, Inc. #, 3. a Fifty (50%) Percent interest, as tenant in common, in certain real estate consisting of sixteen (16) lots; 4. shares of stock in Transdyne Corp.; and 5. other interests together with Stanley A. Revzin, *379 and WHEREAS, STANLEY A. REVZIN is the owner of: 1. Fifty (50%) Percent of the stock of Bristol Electronics, Inc.; 2. Fifty (50%) Percent of the stock of Bristol Industries, Inc.; 3. a Fifty (50%) Percent interest, as tenant in common, in certain real estate consisting of sixteen (16) lots; 4. 400,000 shares of stock in Transdyne Corp.; and 5. other interests together with Robert A. Pullman, and WHEREAS, Robert A. Pullman and Stanley A. Revzin have been associated in the interests above mentioned, and WHEREAS, Robert A. Pullman and Stanley A. Revzin have agreed, after due consideration, that it is for the best interest of each that they dissolve their association and make a distribution and division of their interests so that each shall own in his own right such a part as hereinafter set forth and so that each shall devote his separate talents and energies to his own business activity, and WHEREAS, it is agreed by Robert A. Pullman and Stanley A. Revzin that the following distributions and agreements shall be undertaken to accomplish these purposes. WITNESSETH THIS AGREEMENT made by each party in consideration of their mutual promises herein made and for other *380 good and valuable consideration: 1. Robert A. Pullman will transfer, assign, and give over and deliver to Stanley A. Revzin or his nominee One thousand (1,000) shares of Bristol Electronics, Inc., being Fifty (50%) Percent of all the shares issued and outstanding. 2. Robert A. Pullman will give resignations of all offices which he holds in Bristol Electronics, Inc. as well as his resignation as Director. 3. Robert A. Pullman shall give to Stanley A. Revzin a release of any and all claims, causes of action, or obligations of any kind, which he may have against Stanley A. Revzin. 4. Stanley A. Revzin shall hold harmless Robert A. Pullman from any and all obligations and guarantees arising from any notes, mortgages of the Bristol Electronics, Inc. on which Robert A. Pullman has signed personally. 5. Robert A. Pullman shall assign, sell and deliver over to Stanley A. Revzin or his nominee Fifty (50%) Percent of all the stock issued and outstanding in Bristol Industries, Inc.
6. Robert A. Pullman shall give resignations of all offices which he holds in Bristol Industries, Inc. as well as his resignation as Director. 7. Stanley A. Revzin will hold Robert A. Pullman *381 harmless on any and all obligations arising from any notes, mortgages, or obligations of Bristol Industries, Inc. on which he has signed personally. 8. Robert A. Pullman and R & S Trust and the Trustees thereof shall release Stanley A. Revzin, Bristol Electronics, Inc. and Bristol Industries, Inc. of any obligations under the Trust and any and all guarantees they may have given on behalf of the Trust. 9. Robert A. Pullman covenants, warrants and represents that he has not, since June 4, 1969, created, caused or made any commitments of purchase or other obligations of any kind that would bind either Bristol Electronics, Inc. or Bristol Industries, Inc.
10. Robert A. Pullman agrees that he will do all acts and co-operate in every way to bring about the transfer and delivery of the stock of both corporations to Stanley A. Revzin, including co-operating in obtaining any waivers, or votes necessary. 11. Robert A. Pullman will purchase-sell the one-half interest in the sixteen (16) lots for the sum of Two thousand five hundred ($2,500.00) Dollars. 12. Stanley A. Revzin shall sell and deliver over shares of stock of Transdyne Corp. to Robert A. Pullman or his nominee, *382 which he represents to be all the stock which he owns or controls. 13. Stanley A. Revzin agrees to hold Robert A. Pullman harmless on personal obligations he may have undertaken in connection with Bristol Electronics, Inc. and to give to said Robert A. Pullman a release of any and all claims, causes of action, which he may individually have against Robert A. Pullman. 14. Stanley A. Revzin will hold Robert A. Pullman harmless on any mortgage obligation of Bristol Industries, Inc. or any other obligations in connection therewith. 15. Stanley A. Revzin agrees to either buy the share of Robert A. Pullman or sell his share of the sixteen (16) lots for Two thousand five hundred ($2,500.00) Dollars at the option of Robert A. Pullman. 16. Stanley A. Revzin agrees to give up all interest in the R & S Trust and get a release in connection therewith. 17. Robert A. Pullman shall be paid One hundred thousand ($100,000.00) Dollars as part of the consideration of the consummation of this Agreement. 18. The said One hundred thousand ($100,000.00) Dollars shall be paid as follows: Fifty thousand ($50,000.00) Dollars upon the transfer of stock of Bristol Industries, Inc. and *383 Bristol Electronics, Inc. and the delivery of releases; Twenty-five thousand ($25,000.00) Dollars thirty (30) days thereafter; and Twenty-five thousand ($25,000.00) Dollars sixty (60) days thereafter. 19. The Twenty-five thousand ($25,000.00) Dollars payable thirty (30) days after the transfer of the stock shall be subject to the condition that Robert A. Pullman has not obligated by purchases or otherwise Bristol Electronics, Inc. or Bristol Industries, Inc. after June 4, 1969. 20. Transdyne Corp. shall return all merchandise belonging to Bristol Electronics, Inc. on hand or in process at Transdyne Corp. 21. Stanley A. Revzin shall release Robert A. Pullman from all claims or causes of action which he may have against the said Robert A. Pullman. Witness our hands and seals this 8 day of August, 1969. /s/ Joseph P. Harrington (to RAP) /s/ Robert A. Pullman / Robert A. Pullman /s/ Stanley A. Revzin / Stanley A. Revzin Witnessed: /s/ David S. Barnet to SAR
The two additional agreements prepared and executed during the meeting on August 8, 1969, are set forth below: SUPPLEMENT TO AGREEMENT BETWEEN STANLEY A. REVZIN AND ROBERT A. PULLMAN, DATED *384 AUG. 8, 1969. Item 4 under Stanley A. Revzin on page 1: 400,000 shares of stock in Transdyne Corp., and Bristol Electronics owns certain shares of Transdyne. Par. 1. Change 1,000 shares to "all of his shares". Par. 8. Pullman & Revzin will also hold each other harmless from all claims of BE & BI vs R&S & Transdyne. Par. 9. Purchases or other obligations refer only to those in excess of $1,000. Par.11. Pullman will sell the land. Par.12. Stanley will sell and deliver 400,000 shares and will do everything necessary, including waivers and votes, to cause the transfer of any and all shares of Transdyne which Bristol presently owns unto Pullman.In addition thereto Revzin and Bristol will transfer and assign unto Pullman all right title and interest, if any, of shares in Transdyne which may be issued to Gladstone & Chain. Par. . Revzin will buy. (15) Par.18. Final $25,000 will be paid 45 days after transfer. Par.19. Refers only to obligations in excess of $1,000. Upon payment Pullman will re-affirm the par. 9 warranty. Par.20. Bristol will pay Transdyne when due charges for manufacturing and Transdyne will ship Bristol's material in its possession *385 to Bristol at Bristol's order. Par.22. Closing will be held Monday August 11, at 4:00 in Wareham. Agreement of sale of even date incorporated herein by reference. /s/ Stanley A. Revzin /s/ Robert A. Pullman /s/ Joseph P. Harrington (to RAP) /s/ David S. Barnet to SAR [Untitled Agreement] This agreement made this 8th day of August 1969 between Stanley A. Revzin and Robert A. Pullman. In consideration of $1 the parties agree as follows: 1. A Ford Thunderbird automobile will be transferred from Bristol Electronics Inc. to Robert A. Pullman. 2. Bristol Electronics and Revzin will give Helen Chagnon a general release from all claims etc. arising out of the course of her employment at Bristol Electronics Inc. from its inception to the present date in return for which Helen will resign all offices in Bristol. 3. Revzin and Pullman will cooperate together to limit existing cross liabilities of each other and all entities eg Bristol, Transdyne, R&S to that which exists at the present date. 4. Pullman hereby acknowledges satisfaction of a note and all obligations which may exist in an agreement between the parties dated May 23, 1963, and will return the *386 note to Revzin. (ie in amount of $15,000). 5. Parties will agree between themselves to dispose of surplus army material at Bristol Industries within 30 days. /s/ Stanley A. Revzin /s/ Robert A. Pullman /s/ Joseph P. Harrington (to RAP) /s/ David S. Barnet to SAR The parties scheduled the closing on August 11, 1969, the following Monday, to allow time for arrangements to be made for the transfers and actions required by the agreement. Petitioner, Mr. Pullman and their attorneys attended. Shareholders and directors meetings of both Electronics and Industries were held at the closing.Mr. Pullman and Helen R. Chagnon resigned as directors and officers of both corporations, and Mr. Barnet, petitioner's attorney, was elected as an officer and director. The shareholders of Electronics authorized its directors to redeem Mr. Pullman's stock, to pay what they deemed appropriate, and to execute any documents and releases deemed necessary. [1] The directors of Electronics voted to redeem the 1,125 shares of its stock held by Mr. Pullman for $50,000 and authorized petitioner to execute any necessary documents and releases. [2] The directors of Industries similarly voted to redeem *387 the 450 shares of its stock held by Mr. Pullman for $50,000 and authorized petitioner to execute any necessary documents and releases. [3] The minutes of each meeting of directors recited that the redemption was made in response to a request "received from Robert A. Pullman that the corporation redeem his shares of stock." In addition, the directors of Electronics voted to transfer 283,000 shares of Transdyne stock and an automobile to Mr. Pullman and to assign to him any interest it had in Transdyne stock held in the names of William Gladstone or Milton Chain. *388 At the closing, Mr. Pullman executed assignments of 1,125 shares in Electronics to Electronics and an assignment of 150 shares in Industries to Industries. He also executed a document warranting that he was the owner of 300 additional shares of Industries, the certificate for which had been lost, and that when found the certificate would be delivered to Industries. Mr. Pullman received checks from each corporation in partial payment for his stock. On the date of the closing, petitioner, acting both for himself and for Electronics, executed an assignment of their interests in any Transdyne stock issued to William Gladstone or Milton Chain. On that date 283,000 shares of Transdyne stock were transferred on Transdyne's books from Electronics to the following persons: Name
Number of Shares
Joseph P. Harrington and
Lorraine Harrington
100,000
Sidney Grossman
100,000
Robert A. Pullman
83,000
A subsequent transfer was made on October 7, 1969, of 400,000 shares of Transdyne from Electronics to Mr. Pullman. On the date of the closing, Mr. Pullman executed the following letter in connection with his receipt of Transdyne stock: Bristol Electronics Icd. 651 *389 Orchard St., New Bedford, Mass. and Mr. Stanley A. Revzin 47 Evelyn Street North Dartmouth, Massachusetts
August 11, 1969 Dear Sir: Reference is made to my acquisition from you this date of 683,000 shares of the common stock without par value of Transdyne Corp. I acknowledge that these shares were acquired by you without registration under the Securities Act of 1933, and I hereby warrant and represent to you that I am acquiring these shares for my own account for investment and with no view to the resale or other distribution thereof in any way involving a public offering within the meaning of the Securities Act of 1933. By your acceptance hereof you warrant and represent to me that you have made no efforts to sell these shares, nor have you solicited any offers for the purchase of same during the last twelve months from any person or persons other than the undersigned. I further acknowledge to you that I have made inquiry with respect to the operations and financial condition of the Company, and I have acquired all such information as I deemed necessary or appropriate in connection with my acquisition of these shares. Very truly yours, /s/ Robert A. Pullman ROBERT *390 A. PULLMAN On August 11, 1969, Electronics transferred an automobile to Mr. Pullman. On August 15, 1969, Mr. Pullman executed a sworn statement relating to his receipt of this automobile which contained the following paragraph: I further certify under the pains and penalties of perjury that I was a fifty per cent owner of all outstanding stock in Bristol Electronics Inc., and there was no consideration paid by me for the transfer of the aforementioned Ford Thunderbird automobile. One further document executed by the parties on August 11, 1969, was an indemnity agreement which stated as follows: KNOW ALL MEN BY THESE PRESENTS THAT WE THE UNDERSIGNED INDEMNIFY EACH OTHER AS FOLLOWS: 1.Pullman indemnifies Revzin from claims of all persons on account of any mortgage, note, loan or other obligation of R & S Realty Trust of New Bedford and/or Transdyne Corp. 2.Revzin indemnifies Pullman from claims of all persons on account of any mortgage, note, loan or other obligation of Bristol Industries Inc. or Bristol Electronics Inc. WITNESS OUR HANDS AND SEALS THIS 11th Day of AUGUST, 1969. /s/ Robert A. Pullman /s/ Stanley A. Revzin On October 2, 1969, Mr. Pullman acknowledged *391 in a letter receipt of a check for $25,000 from Electronics and recited that when paid it "shall constitute satisfaction in full of the $100,000 cash payment due from Stanley A. Revzin, Bristol Electronics, Inc. and Bristol Industries, Inc. to Robert A. Pullman under agreements dated August 8 and 11, 1969." The shares of Transdyne had not previously been reflected on the books of Electronics. The following adjusting entries were made on August 31, 1969, to reflect ownership of the stock and transfer of it to Mr. Pullman in exchange for his stock: Investment-Transdyne
203
$ 6,143.91
Capital Surplus
502
$ 6,143.91
Purchase of Treasury Stock
510
56,143.91
Investment in Transdyne
6,143.91
Due R. A. Pullman
50,000.00
Treasury Stock
26,350.00
Paid in Surplus
16,143.91
Retained Earnings
18,093.76
Purchase of Treasury Stock
90,687.67
The Balance Sheet of Electronics as of August 31, 1969, showed a note payable of $50,000 and items listed as Treasury Shares, Paid in Surplus, and Retained Earnings, all referenced to the following note: On August 15, 1969 the company, pursuant to contract entered into on August 11, 1969 between *392 Robert A. Pullman and Stanley A. Revzin on [sic] their designees, purchased the interest of Robert A. Pullman in Bristol Electronics, Inc. That interest consisted of 1,125 shares of issued and common stock representing 50% of all the outstanding common stock of the company. The purchase price for these shares was $60,587.67 consisting of the following: Note due September 15, 1969
$25,000.00
Note due October 15, 1969
25,000.00
Ford Thunderbird Automobile -
Book Value
4,443.76
Bristol Electronics Inc. interest
in 614,391 common shares
Transdyne Corp.
Cost
6,143.91
Total
$60,587.67
The notes referred to above were paid when due. The interest of the company in Transdyne Corp. had never been reflected on the books of the company prior to the current year. The purchase price of these shares, title to which was never clarified by the company, was $.01 per share and the company was able to convey in full satisfaction of its obligations under said agreement only such title as it had of record. On their Federal income tax return for the year 1969, petitioners reported no income from any of the transfers made pursuant to the agreements signed August 8, 1969. *393 Respondent, in his notice of deficiency to petitioners, determined a deficiency in their income tax for 1969 resulting from their failure to include in gross income the amounts of cash, totaling $100,000, and the fair market value of the automobile, asserted to be $4,443.76, transferred to Robert A. Pullman by Electronics and Industries pursuant to the August 8, 1969, agreements. Respondent further determined a deficiency resulting from failure to report a gain of $55,274.24, asserted to have been realized on the exchange of various assets between Robert A. Pullman and petitioner, Electronics, or Industries. This determination was explained by respondent as follows: It is determined that during the tax year 1969 you realized a long-term capital gain in the amount of $55,274.24 which you failed to report. After reflecting the Section 1202 deduction, your taxable income of the tax year 1969 is increased $27,637.12.
The long-term capital gain results from transactions between you and Robert A. Pullman, and/or Bristol Electronics, Inc. and/or Bristol Industries, Inc. and was computed as follows: Received
1/2 Book Value of Bristol Electronics, Inc.
$151,422.00
Personal note satisfied
15,000.00
Various lots of land
2,500.00
Payment of legal fees
2,500.00
1/2 Book Value of Bristol Industries, Inc.
1,500.00
Total Received
1,172,922.00
Gave Up
Cash
$100,000.00
Transdyne Inc. capital stock
6,830.00
Interest in R&S Realty Trust
6,374.00
Automobile
4,443.76
Total give up
117,647.76
Long-term capital gain
$ 55,274.24
Less 50%, Section 1202 Deduction
27,637.12
Increase in taxable income
$ 27,637.12
*394 OPINION Respondent views the transactions among petitioner, Mr. Pullman, Electronics, and Industries as creating taxable gains to petitioners in two distinct ways. First, respondent contends that constructive distributions were made to petitioners, constituting dividend income, when the corporations made transfers of cash and an automobile to Mr. Pullman, allegedly in satisfaction of an unconditional, personal obligation of Stanley A. Revzin arising from the August 8, 1969, agreements. Second, respondent contends that petitioners made a taxable exchange with Mr. Pullman of the amounts constructively received and certain other cash and property for the stock interests, land and other consideration given up by Mr. Pullman. The two sources of alleged gain will be treated here separately. Constructive Dividends
The law is well settled that where an unconditional, personal obligation of a party is satisfied by a corporation in which that party holds stock, the satisfaction constitutes a constructive distribution to the shareholder, taxable to him as a dividend if there are sufficient *395 earnings and profits in the corporation. Numerous cases have held that satisfaction by a corporation of a shareholder's personal obligation to purchase another's stock results in a constructive dividend under this principle. E.g., Sullivan v. United States,363 F.2d 724 (8th Cir. 1966), cert. denied 387 U.S. 905 (1967); Wall v. United States,164 F.2d 462 (4th Cir. 1947). However, there is no constructive distribution where redemption of the stock is the obligation of the corporation and not the personal obligation of the continuing stockholder. Ray Edenfield,19 T.C. 13 (1952). Respondent asserts that the agreements of August 8, 1969, created an unconditional, personal obligation on Stanley A. Revzin to purchase the stock of Robert A. Pullman and to transfer in consideration $100,000 and an automobile. It would then follow that the distributions to Mr. Pullman by the corporations in redemption of his stock satisfied that obligation and constituted a constructive dividend [4] to petitioners. Petitioners argue that no personal obligation was imposed on Stanley A. Revzin by the agreements and that if anyone was *396 obligated under the agreements the corporations were. Thus, the distributions by the corporations would satisfy their own obligations. This issue is thus reduced to the determination of one fact: Whether petitioner Stanley A. Revzin was unconditionally and personally obligated to purchase the stock of Robert A. Pullman and pay as consideration for the stock and other benefits $100,000 and an automobile. The agreements of August 8, 1969, while inartfully drawn, were intended by Stanley Revzin and Robert Pullman to dissolve their mutual investments finally and completely. To this end, they had negotiated through an intermediary and the rough agreement drafted by that intermediary (hereinafter referred to as the initial agreement) was first read by petitioner and his attorney at the meeting on August 8, 1969. In the course of the discussion on August 8, 1969, two *397 additional agreements were drafted. One, entitled "Supplement to Agreement Between Stanley A. Revzin and Robert A. Pullman, Dated Aug. 8, 1969," (hereinafter referred to as the supplemental agreement), was intended to supplement and alter slightly the initial agreement. The other, untitled (hereinafter referred to as the untitled agreement), dealt with items not specifically referred to in the initial agreement. While the agreements were signed by petitioner and Mr. Pullman without indication that the signatures were made in any representative capacity, the agreements required for their execution the acts of the corporate entities of which petitioner and Mr. Pullman owned all the stock. Paragraphs 1 and 5 of the initial agreement provide that Mr. Pullman will transfer, assign, sell and deliver to "Stanley A. Revzin or his nominee" his stock of Electronics and Industries. Paragraph 10 speaks of "the transfer and delivery of the stock of both corporations to Stanley A. Revzin." However, paragraphs 17 and 18 merely provide that Mr. Pullman "shall be paid One hundred thousand ($100,000.00) Dollars as part of the consideration of the consummation of this Agreement," and "[the] *398 said One hundred thousand ($100,000.00) Dollars shall be paid as follows." There is no provision as to who will make the payment. Also, in paragraph 10, Mr. Pullman agrees to cooperate in every way in bringing about the delivery of the stock of the corporation to petitioner, "including co-operating in obtaining any waivers, or votes necessary." The supplemental agreement has clear language requiring action by the various corporations, such as paragraph 20 stating that "Bristol will pay Transdyne when due charges for manufacturing and Transdyne will ship Bristol's material in its possession to Bristol at Bristol's order." Finally, the untitled agreement provides that a "Ford Thunderbird automobile will be transferred from Bristol Electronics Inc. to Robert A. Pullman." This agreement also contains other provisions of actions to be taken by the corporation. Petitioners argue that the wording of the agreements, when viewed in light of the surrounding circumstances, indicates an intent of the parties that Stanley Revzin and Mr. Pullman were acting in representative capacities as well as personally and that the agreements were not intended to and did not bind petitioner personally *399 to purchase Mr. Pullman's stock. Since some of the property exchanged was held by petitioner and Mr. Pullman personally, certain actions were required of them individually. However, petitioners contend that, properly interpreted, Mr. Revzin and Mr. Pullman were also acting as representatives of the corporation. The agreements are poorly drafted and in our view are ambiguous and unclear in their meaning. They reflect agreements between Robert A. Pullman and Stanley A. Revzin, acting only in their individual capacities, and agreements between these two individuals for actions to be taken by corporations of which they are the sole stockholders and the chief officers. Petitioners argue that because of the ambiguities of these agreements we should consider the evidence in the record that petitioner intended that the corporations would purchase the stock and that he considered all three agreements sufficient to provide for the purchase of the stock by the corporations.They argue that both Mr. Pullman and Mr. Revzin understood that the corporations were to purchase the stock as shown by the oral testimony and the fact that three days after signing the agreement Mr. Pullman presented *400 his stock to the corporation for redemption. Petitioners rely on certain oral testimony and other extrinsic evidence to establish that the substance of the agreements is a purchase of the stock by the corporations. It is well established that this Court is not bound by the form of a transaction but may give effect to its substance in an appropriate case. Richard B. Bennett,58 T.C. 381 (1972); William K. Edmister,46 T.C. 651, 661 (1966), affd. 391 F.2d 584 (6th Cir. 1968). Where the language of an instrument is clear and unambiguous a taxpayer must show by strong proof that the true agreement of the parties differs from the clear language. Thomas C. Stephens,60 T.C. 1004, 1012 (1973), affd. without opinion, 506 F.2d 1400 (6th Cir. 1974). [5] However, where an agreement is unclear and ambiguous, the evidence presented must be considered as a whole to glean the substance of the agreement of the parties. Richard B. Bennett,supra.
*401 While some of the testimony on which petitioners rely is the intent of the draftsmen in drafting the documents and their interpretation of them, the record shows that the draftsmen explained their interpretation of the instruments to the parties. The attorney representing petitioner testified that he considered the corporations as well as petitioner and Mr. Pullman to be parties to the agreements and that he so informed petitioner.Petitioner testified that he intended the corporations to purchase the stock of Mr. Pullman and the inference from the record is that this was also the intent and understanding of Mr. Pullman. In conclusion, we have found from the evidence that petitioner was not personally and unconditionally obligated under the agreements signed by him on August 8, 1969, to pay Mr. Pullman $100,000 and an automobile for the stock of Electronics and Industries. Transfer of this consideration was in fact three days later made to Mr. Pullman by the two corporations and the stock was in fact transferred to them. We therefore conclude that petitioners did not receive constructive dividends of $100,000 and $4,443.76 from the transfers to Robert Pullman by the corporations *402 in redemption of the stock held by him in the corporations. Taxable Exchange
Respondent has asserted that Stanley Revzin realized a gain on the exchange of property resulting from the August 8, 1969, agreements. Respondent reasons that certain consideration in the form of property or property rights passed between petitioner and Robert Pullman and that, to the extent that the fair market value of the consideration received by petitioner exceeded the adjusted basis of that given up, petitioner realized a capital gain. Furthermore, respondent asks us to view the corporations as petitioner's agents in transferring and receiving property and asserts that property passing between the corporations and Robert Pullman pursuant to the agreements constructively passed between Mr. Pullman and petitioner. In respondent's view, the following items were exchanged: Property Received
Asserted Fair by Petitioner
Market Value
One-half of the stock of
Electronics
$151,422
One-half of the stock of
Industries
1,500
Satisfaction of petitioner's note
held by Pullman
15,000
Lots of land
2,500
Payment of petitioner's legal fees
2,500
Total
$172,922 Property Given Up
Asserted by Petitioner
Adjusted Basis
Cash
$100,000.00
Transdyne stock
6,830.00
Interest in R & S Trust
6,374.00
Automobile
4,443.76
Total
$117,647.76
*403 Since we have held that the corporations redeemed their own stock, the items of one-half of the stock of Electronics and Industries were not items received by petitioner. In our view the evidence, though not completely clear, indicates that the corporations transferred to Mr. Pullman for his stock $100,000 in cash, an automobile of a value of $4,443.76 and Transdyne stock of a value of $6,830, or a total value of $111,273.76. Since this value was transferred to Mr. Pullman by the corporations, no income would result to petitioner even if the stock surrendered had a value in excess of this amount. However, the evidence shows that it did not. Petitioners produced an expert witness at trial who testified that the fair market value of the corporations, Electronics and Industries, taken together, was between $240,000 and $250,000. In calculating the value of one-half of the stock in the corporations, the expert testified that he would reduce an amount equal to half of these figures by a discount of one-quarter or one-third because stock not bearing control of the corporations was being valued. The expert thus believed that the fair market value of the stock transferred by Mr. *404 Pullman to the corporations was between $80,400 and $93,750. In addition, petitioner testified that he believed the stock was worth less than the $100,000 transferred to Robert Pullman by the corporations. Respondent has asserted that the fair market value of the Electronics stock which he contends was constructively received by petitioner on August 11, 1969, was one-half of the book value of the corporation on August 31, 1969, reduced by the value of the cash and automobile transferred to Robert Pullman, which were still reflected on the corporate books at that time. This amount was $151,422. He asserts that the fair market value of the Industries stock was equal to one-half of the stated capital of that corporation, or $1,500. Thus, the total fair market value of all the stock on August 11, 1969, was asserted to be $152,922. In spite of respondent's efforts to justify use of book value in valuing the stock here in issue at $152,922, we find from the record that the fair market value of that stock was no more than the approximately $111,000 transferred by the corporations in its redemption. We note that book value of a manufacturing corporation is at best only a rough measure *405 of fair market value. Also, we find that a discount from full value would be necessary in this case to reflect that the blocks of stock being sold did not grant control of the corporation. Respondent's asserted figure properly discounted would approach the amounts transferred to Mr. Pullman for the stock. The record shows that under the agreements between petitioner and Mr. Pullman, petitioner personally received the cancellation of a note valued by respondent at its face amount of $15,000 and an interest in lots valued by respondent at $2,500. Respondent determined that petitioner received payment of his legal fees of $2,500, and there is no evidence in the record to show to the contrary. The record shows that petitioner personally transferred to Mr. Pullman his interest in the R & S Realty Trust which respondent valued at $6,374.Accepting respondent's values on the items transferred personally by Mr. Pullman to petitioner, the total is $20,000 for which petitioner transferred to Mr. Pullman items with a basis of $6,374 resulting in a long-term capital gain to petitioner of $13,626. The nature of the negotiations between petitioner and Mr. Pullman and their hostility toward *406 each other, would lead to the suspicion that the items transferred by Mr. Pullman to petitioner had less value than respondent determined and did not have a total value in excess of the value of the trust interest petitioner transferred to Mr. Pullman. However, petitioners totally failed to offer any evidence to show error in the values of the various items as determined by respondent. We cannot substitute suspicions for evidence when, as here, the burden of proof is on petitioners. We, therefore, hold that petitioners had a long-term capital gain from the various transfers of $13,626. Decision will be entered under Rule 155. Footnotes
1. The Minutes of the Special Meeting of Stockholders of Electronics recited in pertinent part: A report was submitted by Stanley A. Revzin indicating that Robert A. Pullman was surrendering his stock in the corporation to the corporation and was dis-associating himself with the company. It was thereupon on motion duly made and seconded, VOTED:↩ To authorize the directors of the corporation to take whatever action was necessary; to give full effect to said purposes; to redeem said Pullman's shares of the corporation and to pay, therefor whatever consideration the directors in their discretion shall deem appropriate; and further, to authorize and to execute whatever other agreements or documents and releases shall be necessary in the premises. 2. The Minutes of the Special Meeting of Directors of Electronics stated in pertinent part: A request was received from Robert A. Pullman that the corporation redeem his shares of stock. It was, therefore, on motion duly made and seconded, VOTED: To redeem 1,125 shares of stock of Bristol Electronics, Inc. standing in the name of Robert A. Pullman for the price of $50,000.00, and the President, Stanley A. Revzin, is hereby authorized and empowered to execute whatever documents may be necessary in the premises. Upon motion duly made and seconded, it was VOTED: That whereas Robert A. Pullman was divesting himself of his entire interest in Bristol Electronics, Inc. and Whereas Helen R. Chagnon was terminating her relationship therewith, that the President, Stanley A. Revzin, is hereby authorized and empowered to execute for and on behalf of the corporation whatever releases or indemnifications as shall be necessary and proper to Robert A. Pullman and Helen R. Chagnon. Upon motion duly made and seconded, it was VOTED: To transfer 283,000 shares of stock of Transdyne Corp., which the corporation owns, unto Robert A. Pullman. Upon motion duly made and seconded, it was VOTED: To assign whatever interest, if any, the corporation may have in and to shares of stock of Transdyne Corp. which may be owned by William Gladstone or Milton Chain, unto Robert A. Pullman. Upon motion duly made and seconded, it was VOTED:↩ To transfer a Thunderbird automobile, which the corporation owns, unto Robert A. Pullman. 3. No reference was made regarding purchase of shares from Robert Pullman or transfer of assets to him in the Minutes of Special Meeting of Shareholders of Industries. However, Minutes of Special Meeting of Directors of Industries recited in pertinent part: A request was received from Robert A. Pullman that the Corporation redeem his shares of stock. It was, therefore, on motion duly made and seconded VOTED: To redeem 450 shares of stock of Bristol Industries, Inc. standing in the name of Robert A. Pullman for the price of $50,000.00, and the President, Stanley A. Revzin, is hereby authorized and empowered to execute whatever documents may be necessary in the premises. Upon motion duly made and seconded, it was VOTED:↩ That whereas Robert A. Pullman was divesting himself of his entire interest in Bristol Industries, Inc., the President, Stanley A. Revzin, is hereby authorized and empowered to execute for and on behalf of the Corporation whatever releases or indemnifications as shall be necessary and proper to Robert A. Pullman.
4. In the instant case both petitioners and respondent agree and the facts show that, at the time the transfers pursuant to the August 8, 1969, agreements were made, the earnings and profits of Electronics and Industries exceeded the amounts which would be regarded as corporate distributions if respondent prevails.↩
5. Respondent urges us to reject any extrinsic evidence produced by petitioners that contradicts what he argues is the clear and unambiguous wording of the agreements. He asserts that the agreements are clear in imposing an unconditional, personal obligation on petitioner, and he urges us to apply the parol evidence rule of the Third Circuit developed in Commissioner v. Danielson,378 F.2d 771 (3d Cir. 1967), cert. denied 389 U.S. 858 (1967): [A] party can challenge the tax consequences of his agreement as construed by the Commissioner only by adducing proof which in an action between the parties to the agreement would be admissible to alter that construction or to show its unenforceability because of mistake, undue influence, fraud, duress, etc. * * * Since we consider the agreement here ambiguous, this rule would have no application even if an appeal in this case would lie to the Third Circuit, which it does not.↩